UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

COREY TURNER,                          :

    Petitioner,                    :
                                     PRISONER
V.                                     :   Case No. 3:06-CV-06 (RNC)

JAMES DZURENDA,                        :

    Respondent.                    :

RULING AND ORDER

Petitioner, a Connecticut inmate serving a sixty year sentence for murder, moves pro se for a writ of habeas corpus vacating his conviction on the ground that he was denied his Sixth Amendment right to effective assistance of counsel.  In a prior state habeas proceeding, petitioner's claims were rejected on the merits under Strickland v. Washington, 466 U.S. 668 (1984).  (See Transcript of Record, Turner v. Warden State Prison, No. CV98-0332808 (Conn. Super. Ct. Jan. 4, 2002)(hereinafter "Jan. 4 Habeas Trial Tr.")).  Petitioner's primary claim is that his trial counsel was ineffective in failing to attempt to impeach the State's main witness with a sworn statement he gave to a detective three days after the murder.  Petitioner also alleges that his appellate counsel was ineffective in failing to claim that the trial court erred in overruling an objection to part of the prosecutor's closing argument.  To obtain federal habeas relief, petitioner must show

1

that the state court applied Strickland in an objectively
unreasonable manner.  See Bell v. Cone, 535 U.S. 685, 699 (2002).
Respondent argues that petitioner has not met this standard.
After careful consideration, I agree and therefore dismiss the
petition.

I.   Background

In 1997, following a joint jury trial in Connecticut
Superior Court, petitioner, Corey Turner, was convicted of murder
and assault in the first degree, and his brother, Charles Turner,
was convicted of being an accessory to these crimes.  The victim,
Richard Woods, was shot in the front yard of a residence at 145
Homestead Avenue in Hartford at about 11:30 p.m. on August 11,
1995.  A number of people were in the immediate vicinity at the
time of the shooting, including Kendrick Hampton, Darius Powell,
and Betty Lewis, all of whom testified for the State at the
trial.

Hampton is the witness whose testimony is at issue here.
Three days after the shooting, he went to the police station and
provided a signed, sworn statement to Detective Keith Knight.
(See Petr.'s Mem. Of Law Ex. A.)[1]  Hampton's statement recounted

---

[1] The notarized statement is three-pages long, single-
spaced, and indicates that it was read by or to Hampton before he
signed it and swore to its accuracy.  Detective Knight testified
at petitioner's trial that he read the complete statement to
Hampton, and asked Hampton if there was anything he wanted to add
or correct.  Hampton then signed the statement attesting to its
accuracy and completeness in the presence of a sergeant.

the following.  On the night of the murder, he was standing in the front yard of 141 Homestead.  Woods and Darius Powell were standing nearby in the front yard of 145 Homestead.  The Turner brothers drove by in a tan Oldsmobile.  Petitioner was known by his street name "Boku"; petitioner's brother was known by his street name "Homicide."  Not long after the Turners drove by together, petitioner's brother returned in the car alone, parked across the street from where Hampton, Woods, and Powell were standing, got out of the car, and looked in their direction while "bobbing back and forth."  At this time, a black male suddenly emerged from behind the residence at 145 Homestead and ran up to Woods and Powell armed with a gun, causing Betty Lewis, who was sitting on the front steps of the residence, to scream.  The black male began to shoot directly at Woods striking him in the leg.  The black male was about "6'0" tall," had a "thin build," and was "wearing a camouflage shirt over his eyes."  Woods yelled to Hampton, "Ken, he shot me in the leg."  The black male shot Woods five more times then ran through a gate leading to the back yard of 145 Homestead.  Petitioner's brother jumped into the Oldsmobile, drove off, and stopped approximately 3 or 4 houses away.  The black male who shot Woods got into the car with

---

(Transcript of Record at 932-33, State v. Turner, No. CR96-485849 (Conn. Super. Ct. Aug. 8, 1997) (hereinafter "Trial Tr.")).  Knight's testimony was significant because Hampton testified that his ability to read is very limited.  (Trial Tr. 265.)

petitioner's brother and the two left the area.  Hampton ran to Woods who was on the ground having been shot multiple times. Woods grabbed Hampton's leg and said "Boku" and "Homicide" shot me.  The black male Hampton saw shoot Woods "fit[] the physical description of 'Boku,'" whom Hampton had known for fifteen years.

At the trial, Hampton gave a somewhat more positive identification of the petitioner as the shooter.  He testified that when the initial shots were fired, he and Woods were looking at petitioner's brother "dancing around" in the street.  In response to the gunfire, he and Woods turned and saw the shooter. The shooter matched the petitioner's height, weight, and build and, although he had a camouflage shirt around his head, his eyes and nose were visible.  (Trial Tr. 230-31.)  After the shooting, according to Hampton's testimony, he saw the shooter run behind the house at 145 Homestead, then emerge from behind a house approximately four houses away, where the tan Oldsmobile was now parked with petitioner's brother at the wheel.  At this time, Hampton testified, the shooter no longer had the camouflage shirt around his head. (Trial Tr. 236.)  Hampton testified that he watched the shooter get in the passenger's side of the waiting car, which then left the area.  Hampton ultimately testified on re-direct that he was "sure" the petitioner and his brother were the perpetrators.  His identification of the petitioner was based on the shooter's height, weight, and build, the shooter's eyes

and nose, and his opportunity to observe the shooter with no head covering.

Hampton was cross-examined extensively, first by counsel for petitioner's brother, then by petitioner's counsel.  In the course of the cross-examination, Hampton made inconsistent statements concerning the time and sequence of key events, and ultimately acknowledged that he had great difficulty remembering things.[2]  He was asked about the statement he gave to Detective Knight and some parts of the statement were admitted into evidence as inconsistent with his trial testimony.  But neither defense counsel questioned Hampton about the discrepancies between his identification testimony and prior sworn statement concerning his degree of certainty that the petitioner was the

_____

[2]  Counsel for petitioner's brother questioned Hampton about inconsistencies in his statements regarding the time he saw petitioner and his brother drive by in the petitioner's car before ths shooting, the time the shooting occurred, the period of time that elapsed between the drive-by and subsequent shooting, and the clothing worn by petitioner's brother.  The lawyer also questioned Hampton about where he was standing at the time of the shooting, his ability to observe what occurred, what the shooter was wearing, where the shooter went after the shooting, Woods's statement that he was shot by "Boku," whether on the night of the shooting Hampton had been drinking or using drugs, whether he was involved in the drug trade, his three-day delay in going to the police to give a statement, and the involvement of the victim's family in his decision to go to the police. Petitioner's counsel cross-examined Hampton about inconsistencies in his statements regarding the location of his residence and whether he was accompanied by a relative of the victim when he went to the police.  He also questioned Hampton about his description of the shooter, the circumstances of the shooting, his memory of the events, and the great difficulty he had remembering things.

shooter, his ability to see the shooter's eyes and nose, and his
opportunity to observe the shooter with no head covering.

Darius Powell testified that he saw the petitioner confront
Woods on Homestead Avenue during the afternoon on the day Woods
was shot and heard him tell Woods, "I don't give a fuck about
you." He also heard petitioner tell Woods, "I'm going to get
mine." (Trial Tr. 516-18.) After the argument, Powell
testified, the petitioner left in his tan Oldsmobile. (Trial Tr.
584-86.) That night, Powell was standing next to Woods in the
front yard of the residence at 145 Homestead when the shooting
occurred. Just before the first shots, he saw petitioner's
brother standing across the street "sort of" looking in their
direction. He sensed someone was approaching from behind, turned
to see who was there, and saw a man with a gun "creeping up" on
them. The gun was a black 9-millimeter pistol similar to one
Powell had seen in the possession of petitioner's brother a week
before. The man was slim and about six feet tall, like the
petitioner, and wore black boots similar to ones the petitioner
wore. (Trial Tr. 536-37.) He was wearing a camouflage shirt
over his face but his eyes were visible and Powell saw part of
the shooter's face. (Trial Tr. 523, 525.) Powell testified that
he looked into the shooter's eyes and realized he had seen them
"lots of times." (Trial Tr. 526.) The shooter fired the gun at
Woods and Woods turned to see who was shooting him. To avoid

6

being hit, Powell jumped over a nearby fence and took cover until
the shooting stopped.  He then went back to assist Woods.  Powell
testified that he saw Woods holding Hampton's leg asking for
help.

The State presented the testimony of several other
witnesses.  Betty Lewis testified that the man who shot Woods was
wearing a dark-colored ski mask covering his face but she could
see his eyes, nose, and mouth.  (Trial Tr. 127, 171-72.)  Lillian
Williams testified that the shooter's build matched that of the
petitioner.  (Trial Tr. 711-12.)  Jesse Keith testified that
after the shooting he went to Woods's side and heard Woods say,
"Boku shot me, man."  (Trial Tr. 605.)

After the State rested its direct case, the trial court
excused the jury and asked defense counsel if they intended to
present an alibi defense.  They said they had no plans to do so.
The court then advised petitioner and his brother that they had a
right to testify.  The next day, petitioner's counsel informed
the prosecutor that he would like to call an alibi witness, Fonda
Williams, with whom the petitioner has a child.  The prosecutor
asked the court to preclude Williams from testifying on the
ground that the petitioner had failed to provide notice of his
alibi, notwithstanding the State's request that he do so, which
the State had submitted a year earlier.  Petitioner's counsel
argued that there was good cause for the late disclosure because

petitioner did not tell him about this alibi witness until after
the State rested.  Petitioner told the court that he did not
disclose his alibi witness earlier because he did not decide to
testify until after the court advised him of his right to do so.
The court ended up ruling that Williams would be allowed to
testify but only after the State had an adequate opportunity to
prepare to cross-examine her.

The petitioner then took the stand.  He testified that the
day before the murder, he was released from jail in New York City
and returned to Connecticut.  The next day, he had his car towed
to a garage to be repaired.  After the car was towed, he went to
Homestead Avenue to see Woods.  Petitioner testified that he and
Woods were "like brothers" and their families were friendly with
each other.  According to petitioner's testimony, Woods gave him
a ride to the garage to pick up the car and lent him money to
help pay for the repairs.  Petitioner testified that he then
drove to his brother's house.  At about 8:00 that night,
petitioner testified, he and his brother picked up Williams and
petitioner's son and drove to Williams's apartment.  Petitioner
testified that his brother then left in the car alone.  According
to petitioner's testimony, he remained in the apartment with
Williams for the next six hours.  His brother eventually returned
to get him, according to petitioner's account, between 1:00 a.m.
and 2:00 a.m.  Petitioner testified that his brother informed him

that Woods had been shot.  The two then drove to the scene of the shooting and "walked around" before going to a club.

On cross-examination, petitioner admitted that his street name is "Boku" and that Woods knew him by this name.  He also admitted that he had been convicted of narcotics offenses in Connecticut and New York.  He denied having a confrontation with Woods on the day of the murder, and denied being present when Woods was murdered.  With regard to the belated disclosure of his alibi witness, petitioner stated that he "didn't decide to testify until Friday, and if [he] wasn't going to testify, there was no need for [Williams] to testify."

The prosecutor questioned petitioner about a telephone call he placed to Williams from jail after he belatedly disclosed her as an alibi witness and she was interviewed by the State.  Petitioner acknowledged that in the course of this telephone conversation, which was routinely recorded by the Connecticut Department of Correction, he asked Williams to tell him what questions had been asked by the prosecutor during the interview.  He acknowledged telling Williams that it "would have been sweeter" if she had said "not to my knowledge" when asked if he ever had a gun.  He also acknowledged telling her that the murder happened the day after he was released from jail.  Finally, he acknowledged telling her, "Don't worry, when Daddy come home, everything will be all right.  I'll reimburse you for this."

When Williams took the stand, her testimony concerning petitioner's alibi matched his.  She testified that on the night of the murder, petitioner and his brother met her at her parents' house at about 7:30 p.m. or 8:00 p.m., and drove her and her son to her apartment.  Petitioner's brother then left in the petitioner's car, she testified, and the petitioner stayed with her in the apartment until his brother came back to get him at 1:30 a.m. or 1:45 a.m.  She testified that she could recall the day in question because petitioner had been released from jail the day before.  She testified that she was able to recall the time he left her apartment because she looked at a clock, saw that it was almost 2:00 a.m., and realized his late departure left her little time to sleep before she had to get up to go to work at a store in Hartford at 7:00 a.m.  The prosecutor successfully impeached this testimony by showing that Williams's first day as an employee of the store in Hartford was several months after the murder.

The prosecutor cross-examined Williams regarding the telephone conversation she had with the petitioner after she was interviewed by the State.  She acknowledged discussing the substance of the interview.  She admitted that petitioner told her "it would have been sweeter" if she had not told the prosecutor he had been in possession of guns in the past.  The prosecutor asked if the petitioner reminded her that the date of

the murder was the day after he got out of jail.  Williams
responded that she had an independent recollection of the date.

Petitioner's brother also testified on his own behalf and in
support of petitioner's alibi.  He admitted that he was standing
across the street from Woods, Hampton, and Powell when the murder
occurred.  He testified that he saw the shooter but did not see
where the shooter came from.  He testified that when the shooting
started, he jumped in petitioner's car and left the scene.  He
denied stopping to pick up the shooter.  He claimed that after he
left the scene, he visited a woman named Josephine Mitchell and
told her about the shooting.  He then drove around for awhile,
"smoked a little bit of weed," and picked up the petitioner at
Williams's house at about 1:00 a.m.

The prosecutor cross-examined petitioner's brother regarding
a telephone call he made from jail to his mother concerning
Josephine Mitchell.  He denied telling his mother to instruct
Mitchell "what the fuck to say."  He also denied telling his
mother that if Mitchell did not remember what happened, his
mother should tell Mitchell to just say that she did.  Later, he
changed his testimony and said that he did not deny making these
comments but did not recall making them.

In rebuttal, the State called a witness from the Department
of Correction to testify about tape recordings of three telephone
calls that had been placed from Walker Correctional Institution,

two by the petitioner's brother, one by the petitioner.  The recordings were admitted to rebut the testimony of the petitioner and his brother concerning the content of the calls.

After the State rested, petitioner's counsel offered the recording of the petitioner's telephone conversation with Williams concerning her interview with the prosecutor.  The State objected.  Petitioner's counsel argued that the tape was relevant to rebut insinuations that the prosecutor had made about the content of the conversation.  The trial court excluded the tape on the ground that it was being offered as a prior consistent statement.

In closing argument, the prosecutor argued that the evidence established the guilt of the petitioner and his brother beyond a reasonable doubt.  The prosecutor did not focus on Hampton's testimony that he saw the shooter's eyes and nose at close range and subsequently saw the shooter with no head covering. Petitioner's counsel argued that Hampton's testimony was not credible and that Williams's testimony established the petitioner's innocence.  In rebuttal, the prosecutor challenged the petitioner's alibi:

> Now he tells you he's known about this for
> years, he's known about it since the day of
> the shooting.  If you know that you have an
> alibi witness, do you wait until the weekend
> after the State's case is done to contact
> your witness and talk to her the night before
> she's going to testify to find out if
> everything is all set?  Did he call her that

> night just to find out if everything was all
> set or did he call her that night to make
> sure his testimony matched with hers?  They
> both acknowledged they talked about the
> testimony in the case.

(Trial Tr. 1466-67.)

Counsel for petitioner's brother objected to this argument
on the ground that the prosecutor was arguing facts not in
evidence.  The trial court overruled the objection and the
prosecutor continued her argument, stating:

> They both admitted to talking to one another
> July 29th, after her meeting with me.  They
> both admitted they discussed the substance of
> their testimony and my questions to her.

(Trial Tr. 1467.)

Petitioner appealed his conviction on a variety of grounds.
Each of his claims was rejected by the Connecticut Supreme Court.
See State v. Turner, 252 Conn. 714, 751 A.2d 372 (2000).
Petitioner then filed a state petition for a writ of habeas
corpus claiming ineffective assistance of trial and appellate
counsel.  The petition claimed that petitioner's trial counsel
was ineffective in failing to impeach Hampton's identification
testimony with the written statement he gave to Detective Knight.
The petition alleged that petitioner's appellate counsel was
ineffective in failing to claim that the objection to the
prosecutor's reference during closing argument to the telephone
conversation between the petitioner and Williams should have been
sustained.

At the state habeas hearing, petitioner's trial counsel was given an opportunity to explain why he did not cross-examine Hampton regarding the discrepancies between his identification testimony at trial and prior sworn statement.  He testified that although Hampton's trial testimony identified the petitioner with greater certainty than the earlier statement, he saw no inconsistency between the two that could be used to undermine Hampton's credibility.  He explained:

> It's a judgment call. . . . [H]e didn't say anything at trial that disagreed with what he said in his [prior] statement. . . . The testimony that Mr. Hampton gave at trial was more specific and more detailed and more specific and more detailed and more positive than what he said in his statement. . . . But, it was not inconsistent with what he said.  He just said more.

(Transcript of Record at 106-07, Turner v. Warden State Prison, No. CV98-0332808 (Conn. Super. Ct. Jan. 3, 2002)(hereinafter "Jan. 3 Habeas Trial Tr.")).

Petitioner's counsel testified that he did not confront Hampton with the prior signed statement because:

> [Hampton] was so emphatic . . . in his direct examination, I was concerned that, by going over and trying to contradict him, that I would give him the opportunity to be more emphatic with the jury.  I wasn't confident that the cross-examination would break his testimony.  I thought it would offer an opportunity to reinforce his testimony.

(Jan. 3 Habeas Trial Tr. 100.)

The state habeas court agreed with petitioner's counsel that

14

whether Hampton's trial testimony and prior signed statement are inconsistent is a "judgment call" (Jan. 4 Habeas Trial Tr. 51), and concluded that petitioner's counsel decided to refrain from cross-examining Hampton more extensively with regard to the prior statement "for strategic reasons" (Jan. 4 Habeas Trial Tr. 53). The court observed that Hampton was not going to change his testimony identifying the petitioner as the shooter, and that the evidence before the jury when Hampton finished testifying permitted the jury to have a reasonable doubt about the defendant's guilt.  (Jan. 4 Habeas Trial Tr. 51-52.)  The court also concluded that further cross-examination regarding Hampton's signed statement would not have changed the result of the trial. (Jan. 4 Habeas Trial Tr. 49, 53.)

With regard to the alleged ineffectiveness of appellate counsel, the state habeas court found that petitioner failed to prove by a preponderance of evidence that his appellate counsel performed in a deficient manner.  (Jan. 4 Habeas Trial Tr. 49, 61.)  The court reasoned that the exclusion of the tape recording did not preclude the prosecutor from referring to the telephone conversation because "there was testimony about what was on the tape.  The petitioner testified about it, Miss Williams testified about [it], the jury already had the information.  Having the tape itself wouldn't have made any difference."  (Jan. 4 Habeas Trial Tr. 61.)  Accordingly, the petition was dismissed.  (Jan. 4

15

Habeas Trial Tr. 64.)

Petitioner's request for certification to appeal was denied. The Connecticut Appellate Court dismissed petitioner's uncertified appeal, Turner v. Comm'r of Corr., 86 Conn. App. 341, 861 A.2d 522 (2004), and the Connecticut Supreme Court denied certification to appeal. Turner v. Comm'r of Corr., 272 Conn. 914, 866 A.2d 1286 (2005). Petitioner then filed this petition.[3]

II. Discussion

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State

---

[3] On May 26, 2004, before the Connecticut Appellate Court's decision on petitioner's uncertified appeal, petitioner filed a second state habeas petition claiming that his trial counsel provided ineffective assistance. The petition was dismissed because it failed to present any new evidence in support of the claim. Turner v. Warden, No. CV04-0004567 (Conn. Super. Ct. Aug. 27, 2004). The Connecticut Appellate Court dismissed petitioner's appeal, Turner v. Comm'r of Corr., 97 Conn. App. 15, 902 A.2d 716 (2006), and the Connecticut Supreme Court denied certification to appeal. Turner v. Comm'r of Corr., 280 Conn. 922, 908 A.2d 546 (2006).

On December 17, 2004, petitioner filed a third state habeas petition claiming ineffective assistance of counsel by his habeas appellate counsel on his first state habeas appeal. The state habeas court held a two-day trial and issued a written decision denying the petition on the merits. See Turner v. Comm'r of Corr., No. CV04-4000240, 2007 WL 2200489 (Conn. Super. Ct. July 2, 2007); Turner v. Comm'r of Corr., No. CV04-4000240, 2007 WL 2035129 (Conn. Super. Ct. June 20, 2007). The court concluded that "[t]here are no issues remaining to be litigated in connection with the petitioner's . . . conviction. Any further petitions for a writ of habeas corpus shall be considered successive and abusing the privilege of the writ." Turner, No. CV04-4000240, 2007 WL 2035129, at *6.

court shall not be granted with respect to any claim
that was adjudicated on the merits in State court
proceedings unless the adjudication of the claim -
    (1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme
Court of the United States; or (2) resulted in a decision that was bas
determination of the facts in light of the evidence presented in
the State court proceeding.

28 U.S.C. § 2254(d).

Petitions for federal habeas relief alleging state court

errors in applying Strickland are assessed under the

"unreasonable application" clause of AEDPA.  Bell, 535 U.S. at

698-99.  To permit habeas relief under this clause, "a state

court decision must be not only erroneous but also unreasonable.

Some increment of incorrectness beyond error is required."

Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).

Strickland establishes a two-prong test for determining

whether the Sixth Amendment right to effective assistance of

counsel has been violated.  The defendant must prove that (1) his

counsel's performance fell below an objective standard of

reasonableness under prevailing professional norms; and (2) but

for his counsel's errors, there is a reasonable probability the

result of the proceeding would have been different.  Strickland,

466 U.S. at 688, 694.  Failure to show "either deficient

performance or sufficient prejudice defeats the ineffectiveness

claim."  Id. at 700.

In applying the first prong of Strickland, a court must

operate with a strong presumption that counsel's conduct fell within the wide range of competent assistance. <u>Lindstadt v. Keane</u>, 239 F.3d 191, 198-99 (2d Cir. 2001). In gauging the alleged deficiency, the court must consider all the circumstances and make every effort to eliminate the distorting effects of hindsight. <u>Id.</u> at 199. "As a general rule, a habeas petitioner will be able to demonstrate that [his] trial counsel's decisions were objectively unreasonable only if 'there [was] no . . . tactical justification for the course taken.'" <u>Lynn v. Bliden</u>, 443 F.3d 238, 247 (2d Cir. 2006) (quoting <u>United States v. Luciano</u>, 158 F.3d 655, 660 (2d Cir. 1998).

A.   <u>Trial Counsel</u>

Petitioner contends that his trial counsel's failure to attempt to impeach Hampton's identification testimony with the sworn statement given to Detective Knight three days after the murder was objectively unreasonable under <u>Strickland</u>. Petitioner's argument has some force. Petitioner went to trial relying on a defense of misidentification. (<u>See</u> Jan. 3 Habeas Trial Tr. 83.) This defense had some chance of success because it was undisputed that the shooter tried to conceal his identity by placing a shirt on his head as a mask. At the trial, Hampton testified that he could see the petitioner's eyes and nose, despite the mask, and subsequently saw the petitioner without the mask (as he rejoined his brother in the Oldsmobile). Hampton's

prior sworn statement, which omitted these points and referred to the shooter only as a "black male" who "fit the physical description" of the petitioner, gave the defense impeachment material that potentially could raise a question in the jurors' minds about Hampton's testimony identifying the petitioner as the shooter.  This material was not as powerful as a direct contradiction, but inconsistencies on important points can undermine credibility and they can be shown by omissions.  See State v. Whelan, 200 Conn. 743, 750 n.4 (1986)(in determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined); see also United States v. Meserve, 271 F.3d 314, 320-21 (1st Cir. 2001)(prior statement that omits details included in trial testimony is inconsistent if it would have been "natural" for the witness to include the details in the earlier statement); United States v. Trzaska, 111 F.3d 1019, 1024-25 (2d Cir. 1997) (variation that reasonably bears on credibility suffices to make prior statement admissible).

The sworn statement Hampton gave to Detective Knight purports to be an accurate and complete statement of what he saw when his friend was killed just three days earlier.[4]  A jury

---

[4]  As noted previously, Detective Knight specifically testified that he asked Hampton if there was anything that Hampton wanted to add to or correct in the statement.  (See Trial Tr. 265, 932-33.)

could find that it would have been natural for Hampton to
disclose to the Detective the details he provided at trial
concerning his ability to see the petitioner's eyes and nose at
close range, although the makeshift mask was in place at the
time, and his subsequent sighting of the petitioner without the
mask.  In addition, a jury could find it curious that Hampton was
more certain of his identification of the petitioner when he
testified at trial, approximately two years after the murder,
than he apparently was when he spoke with Detective Knight soon
after the event.  Given petitioner's reliance on a defense of
misidentification, these points were clearly proper for the
jury's consideration and thus worth making.[5]

Moreover, cross-examining Hampton regarding the
discrepancies between his identification testimony and prior
sworn statement posed little or no risk to the defense.  A cross-
examiner armed with Hampton's prior sworn statement would have an
undoubted right to lay before the jury the discrepancies at issue
through questions fairly calling for a yes or no.  In the event
Hampton responded by trying to repeat or reinforce his earlier

---

[5] Connecticut's standard criminal jury instruction on
identification testimony requires the jury to take into account
the opportunity the witness had to observe the person, the degree
of certainty of the identification made in court, the
circumstances and degree of certainty of any out of court
identification, the length of time between the event in question
and the identification in court or out of court, and any other
relevant circumstances.  See 5 David M. Borden & Leonard Orland,
Conn. Practice Series, Criminal Jury Instructions § 3.14.

testimony, the court could be called on to instruct him to answer yes or no if he could do so truthfully.  In addition, the trial transcript shows that Hampton was not a strong witness.  His testimony was so vague and inconsistent with regard to key points that the prosecutor downplayed the importance of his testimony in her closing argument, although he was her principal witness. Given the other inconsistencies in his testimony, there was no reason for petitioner's counsel to refrain from bringing more inconsistencies to the jury's attention.[6]

Nevertheless, I agree with respondent that the state habeas court did not unreasonably apply the first prong of Strickland. The state court was entitled to credit the testimony of petitioner's counsel that he was fully familiar with the contents of Hampton's prior sworn statement and consciously chose to refrain from cross-examining him more aggressively for strategic reasons.  Under Strickland, habeas courts are reluctant to second-guess reasonably informed decisions made by counsel with an eye toward benefitting the defendant.  See Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002)("Decisions about 'whether to

---

[6]  It is conceivable that experienced counsel might have decided to forego cross-examining Hampton regarding the discrepancies at issue to avoid the risk that the prosecutor would attempt to rehabilitate Hampton by getting him to testify that when he spoke with Detective Knight he was scared.  But the trial court did not permit the prosecutor to try to paint Hampton as a target for retaliation and there is no reason to believe the court would have ruled differently if Hampton had been cross-examined more fully regarding his prior sworn statement.

engage in cross-examination, and if so to what extent and in what
manner, are . . . strategic in nature' and generally will not
support an ineffective assistance claim.")(quoting <u>United States
v. Nersesian</u>, 824 F.2d 1294, 1321 (2d Cir. 1987); <u>Pavel v.
Hollins</u>, 261 F.3d 210, 217 (2d Cir. 2001).  If the
inconsistencies between Hampton's identification testimony and
prior sworn statement were more serious, a decision to forego
cross-examining him on the inconsistencies might well be
objectively unreasonable.  See <u>Harris v. Artuz</u>, 100 F. App'x 56,
58-59 (2d Cir. 2004); <u>Berryman v. Morton</u>, 100 F.3d 1089, 1098-99
(3d Cir. 1996); <u>Harris v. Senkowski</u>, 298 F. Supp. 2d 320, 337,
340 (E.D.N.Y. 2004).  But that is not the situation presented
here.  "Critically, the purported inconsistencies largely do not
consist of facts that *changed* between [Hampton's] earlier account
and his trial testimony, but facts that were *absent* from the
earlier statement." <u>Espinal v. Bennett</u>, Nos. CV-00-1337(DGT) &
CV-00-6536(DGT), 2008 WL 5104237, *20 (E.D.N.Y. Dec. 5, 2008).  A
reasonable jury could find that the omissions from Hampton's
sworn statement to Detective Knight regarding his ability to see
the shooter's eyes and nose and his subsequent sighting of the
shooter without the head covering were not so important as to
affect the credibility of his identification testimony in court.

Even if the state court unreasonably applied the first prong
of <u>Strickland</u>, petitioner cannot obtain relief unless he carries

his burden under the second prong.  To meet his burden in this regard, petitioner must show that his counsel's error actually prejudiced the defense to the extent that it "undermine[s] confidence in the outcome." Strickland, 466 U.S. at 694.  To satisfy this test, a defendant does not have to show that his counsel's deficient conduct more likely than not altered the outcome.  Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005).  But merely showing that it had some conceivable effect is insufficient.  See id.

Petitioner's claim that his counsel's failure to attempt to impeach Hampton was sufficiently prejudicial to satisfy the second prong of Strickland cannot be dismissed out of hand. Hampton's testimony was clearly important to the prosecution's case.  He was the only witness who testified that he saw the petitioner and his brother in the Oldsmobile shortly before the shooting and he was the only one who identified the petitioner as the shooter.  The other evidence of petitioner's guilt was not overwhelming.

Here again, however, I conclude that the state habeas court did not unreasonably apply Strickland.  Petitioner's counsel's failure to impeach Hampton's identification testimony with his statement to Detective Knight was not as prejudicial as petitioner now claims.  The probative value of the discrepancies between Hampton's testimony and prior statement is the suggestion

that he was unsure of his identification when he spoke with Detective Knight because he did not actually see any part of the shooter's face.  It is unlikely that this suggestion, had it been raised by petitioner's trial counsel, would have swayed the jury to have a reasonable doubt about petitioner's guilt.

If this suggestion had been raised, the prosecutor could have persuasively argued that Hampton's prior statement actually evinces no uncertainty about the identity of the perpetrators. The statement positively identifies petitioner's brother as the person who worked in concert with the shooter by setting up the ambush and helping the shooter escape; it effectively identifies petitioner as the shooter; and it even provides a motive for the murder (one that did not come out at trial).[7]

To rebut the suggestion that the shooter's mask prevented Hampton from seeing any part of the shooter's face, the prosecutor could point to testimony of other witnesses corroborating Hampton's trial testimony.  As previously mentioned, Darius Powell testified that he saw the shooter's eyes and part of the shooter's face and had seen those eyes "lots of times."  (Trial Tr. 523, 525-26.)  Betty Lewis testified that the man who shot Woods was wearing a ski mask but she could see his

---

[7]  Hampton told Detective Knight that Woods blamed the Turner brothers for stealing $20,000 in drug proceeds from his house and that they were afraid of what he might do to them. (Petr.'s Mem. Of Law Ex. A at 1.)

eyes, nose, and mouth. (Trial Tr. 127, 171-72.)  And Jesse Keith, who came to Woods's aid, corroborated Hampton's testimony that Woods himself identified the shooter as "Boku." (Trial Tr. 594, 605.)  In view of the testimony of these other witnesses, there is no reasonable probability that if petitioner's counsel had impeached Hampton using the omissions from his prior sworn statement, the outcome of the trial would have been different.

In assessing the issue of prejudice, it is appropriate to consider that after the State rested, petitioner decided to present an alibi defense.[8]  In electing to testify, petitioner gambled that the jury would not believe him.  By their verdict, the jurors made it clear that they thought his alibi was false.  There is no reason to think that if petitioner's counsel had cross-examined Hampton more fully regarding his prior statement, the jury would have come to a different conclusion regarding the veracity of petitioner's own testimony (or that of his brother and Williams).

B. <u>Appellate Counsel</u>

Petitioner alleges that his appellate counsel was ineffective in failing to claim that the trial court erred when it overruled the objection to the prosecutor's closing argument

---

[8]  Petitioner does not allege that but for his counsel's failure to impeach Hampton's identification testimony with the prior statement, he would have refrained from presenting an alibi defense.

regarding the telephone conversation he had with Williams about
her interview with the prosecutor.[9]  This claim requires little
discussion.  The Second Circuit has adopted the two-prong
Strickland test for appellate counsel.  See Claudio v. Scully,
982 F.2d 798, 803 (2d Cir. 1992).  Petitioner may establish
deficient performance if he shows that appellate counsel "omitted
significant and obvious issues while pursuing issues that were
clearly and significantly weaker."  Mayo v. Henderson, 13 F.3d
528, 533 (2d Cir. 1994).  Appellate counsel does not have a duty
to advance every nonfrivolous argument that could be made.  See
Jones v. Barnes, 463 U.S. 745, 751-52 (1983)("Experienced
advocates since time beyond memory have emphasized the importance
of winnowing out weaker arguments on appeal and focusing on one
central issue if possible, or at most on a few key issues.").

     To prevail on his claim, petitioner must show that the state
habeas court unreasonably applied Strickland when it rejected
this claim.  He has not made this showing.[10]  Petitioner's
belated disclosure of an alibi, the timing of his call to
Williams, and the testimony of the petitioner and Williams

---

     [9]  Petitioner initially also alleged that his appellate
counsel was ineffective for failing to claim that the prosecutor
committed misconduct during closing argument when she argued that
Hampton was a target for retaliation for having testified against
the petitioner.  This allegation has been withdrawn.  (Petr.'s
Mem. Of Law 1.)

     [10]  Petitioner's memorandum does not address this claim.

concerning the contents of the call, provided an adequate basis in the record for the prosecutor's argument.  The exclusion of the tape did not preclude the prosecutor from making the argument.  Thus, the objection to the prosecutor's argument was properly overruled.  Since the court's ruling was proper, petitioner's appellate counsel was not ineffective in failing to claim otherwise.

III. <u>Conclusion</u>

Accordingly, the petition is hereby dismissed.  Because petitioner's claim with regard to his trial counsel is not insubstantial, a certificate of appealability will issue on the following questions: (1) whether the state habeas court's rejection of petitioner's claim that his trial counsel was ineffective in failing to cross-examine Hampton concerning the discrepancies between his identification testimony at trial and prior sworn statement constitutes an unreasonable application of the first prong of <u>Strickland</u>; and (2) whether the state habeas court's determination that petitioner failed to show a reasonable probability that but for his trial counsel's error the outcome would have been different constitutes an unreasonable application of the second prong of <u>Strickland</u>.

So ordered this 30th day of January 2009.

<pre>
                        /s/ RNC
                   Robert N. Chatigny
                United States District Judge
</pre>